**In re Field McCONNELL, and Alison McConnell, Debtors.**

No. 03–60110.

United States Bankruptcy Court, D. Minnesota.

May 30, 2003.

---

6. *Bowman v. Jack Bond* (*In re Bowman*), 253   B.R. 233, 240 (8th Cir. BAP 2000).

**198**

David L. Johnson, Fargo, ND.

Jon Richard Brakke, Vogel, Brantner, Kelly, Knutson, Fargo, ND.

Michael J. Farrell, Barnesville, MN, trustee.

Carl E. Malmstrom, Detroit Lakes, MN.

Michael T. Oberle, Peterson, Fram & Bergman, St. Paul, MN.

Max A. Wernick, Dallas, TX.

## ORDER DENYING CONFIRMATION OF CHAPTER 13 PLAN

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter was heard on May 27, 2003, on objection by NWA Credit Union to confirmation of the Debtors' proposed Chapter 13 Plan. David Johnson appeared on behalf of the Debtors, and Michael Ob-erle appeared on behalf of NWA Credit Union. Based on testimony and exhibits heard and received at the hearing, and on arguments and briefs submitted, the Court now makes this **ORDER** pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### I.

Field McConnell is a long time pilot with Northwest Airlines. Alison is a homemaker. In the two years preceding this bankruptcy, the Debtors listed their incomes as $190,000, in 2001, and $200,000, in 2002, from Field's salary as a pilot. The Debtors claim to be farmers as well, listing $11,863, farm income in 2001, and $24,015 farm income in 2002. The petition for relief under 11 U.S.C. Chapter 13 was filed on January 30, 2003.

The Debtors purchased 60.42 acres of rural land in 1991, on contract for deed. In 1997, they obtained a mortgage loan from NWA Credit Union to pay off the contract. The loan was a residential loan initiated on a Uniform Residential Loan Application produced by Fannie Mae and Freddie Mac. The loan application does not disclose any farming activity conducted by the Debtors on the mortgaged property, or elsewhere, and the application lists their occupations as "NWA" and "Home maker." The stated purpose of the loan transaction was "Payoff higher interest non-deductible consumer debt, and lower interest." This was accomplished through a $200,000, first mortgage and a $50,000, home equity loan second mortgage. The loan documents do not reflect, and there is nothing elsewhere in the record that would indicate, that the purpose of the loan was to finance the purchase of income producing property or that income from any agricultural endeavor involving the property or other property would be used to pay NWA Credit Union's two mortgages.

Aside from their residence, four outbuildings are located on the Debtors' property that is subject to the Credit Union's mortgage.

| | |
|---|---|
| dairy barn | 4800 sq. ft. |
| general purpose bldg | 60 × 72 ft., two story |
| sheep barn | 24 × 40 ft. |
| cattle barn | 48 × 72 ft. |

The residence and outbuildings comprise 18 acres, while the balance of the parcel is pasture. The 60.42 acres adjoin an additional 100 acres, not financed through NWA, which together comprise the Debtors' homestead.

Field McConnell testified that he and Alison had been engaged in more than one type of animal raising endeavor for profit since his initial purchase of the property in 1991. At filing, they were breeding registered English breed white cattle, and had between 110 and 120 animals that he described were in good condition.

The Debtors' Plan would recognize that NWA Credit Union is fully secured on its mortgage notes, but would reduce the interest rates and recapitalize existing defaults to be paid over the course of the Plan. NWA Credit Union claims that its contract position is protected by 11 U.S.C. § 1322(b)(2), subject to cure under 11 U.S.C. § 1322(b)(5), and that the Plan as proposed is not confirmable. The Debtors argue that because a substantial portion of the 60.42 acre property securing the mortgage notes is property other than their residence, they are entitled to modify the contract rights of NWA Credit Union. The Court agrees with the Credit Union and denies confirmation, based on impermissible treatment of NWA Credit Union's allowed secured claim.

## II.

■ The relevant portion of 11 U.S.C. § 1322(b) provides that a plan may:

modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims. *11 U.S.C. § 1322(b)(2)*

There is an exception to the provision that prohibits cram down of residential mortgages, however.

notwithstanding paragraph (2) of this subsection, [the plan may] provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due. *11 U.S.C. § 1322(b)(5)*

The Debtors argue that because their residence comprises only a small portion of the 60.42 acres securing the Credit Union's mortgage notes, NWA's claim is not "secured only by property that is the debtor's principal residence," and that they can modify the Credit Union's rights under its claim. The Debtors cite *In re Leazier*, 55 B.R. 870 (Bankr.N.D.Ind.1985) and *In re Hines*, 64 B.R. 684 (Bankr.D.Colo.1986).

In *Leazier*, Jerry and Linda Poulsen sold their farm to the debtor by land contract in 1981. The debtor paid $50,000 down on the $250,000 purchase price. Later, in bankruptcy, the debtor proposed to pay the Poulsens the market value of the farm, which was substantially less than the remaining balance due on the contract. The farm consisted of eighty acres, which included a residence, a pole building and some grain storage facilities. The court confirmed the debtor's plan over the objection of the Poulsens.

The vast majority of the reported decisions address the paradigm situation of a single family residence on a small lot. *In re Arnold*, 40 B.R. 144 (Bkrtcy.

N.D.Ga.1984); *In re Coffey*, 52 B.R. 54 (Bkrtcy.D.N.H.1985). Linda Poulsen holds a security interest in an entire eighty-acre farm. The nature of her financing is fundamentally different from that of a § 1322(b)(2) creditor. She is financing an extensive tract of income-producing crop land. The § 1322(b)(2) creditor is not financing an income-producing asset. *Section 1322(b)(2)* does not prevent farmers who qualify for chapter 13 relief from modifying the rights of creditors who hold security interests in their farm land. *[FN1]* Small farmers should not be forced to convert to chapter 11 for the sole reason that their home occupies an acre of their farm. The creditor in the case at bar holds a security interest in far more than the debtor's residence and is therefore not protected by § 1322(b)(2).

*In re Leazier*, 55 B.R. at 871, 872.

In *Hines*, the debtor borrowed $20,000 from a bank in May, 1985, for the purpose of building a fruit drying facility on his farm property, which consisted of 20 acres. He lived in a farmhouse on the property. The senior vice president of the bank testified that the loan was a commercial loan. He knew the debtor intended to use the borrowed funds to construct a fruit drying facility and believed the idea was a good one. As in *Leazier*, the debtor proposed a plan that would pay the bank market value, which was less than the amount owed on the mortgage note. The court confirmed the plan over the bank's objection.

There is extensive discussion surrounding the issue of the types of loans intended to be subject to the modification prohibition of § 1322(b)(2). However, this issue is not relevant to the case at bar, because the creditor here cannot claim exemption from modification of its rights because it holds security which includes property in addition to the Debtor's principal residence, namely, the remainder of the Debtor's farm.

*In re Hines*, 64 B.R. at 686.

■ Although the statutory language is not as clear as it might be, and legislative history is not extensive, the purpose of the statute is to protect the stability and affordability of the residential lending market by excluding cram down of residential loans, while at the same time provide debtors a limited remedy of default cure in Chapter 13 to save homes that are in peril of foreclosure.

The legislative history says little in terms of political or social philosophy as such. However, it does reveal that the final language of *section 1322(b)* evolved from earlier language, incorporated in the bill apparently at the behest of representatives of the mortgage market, *[FN1]* that would have prohibited modification of the rights of all creditors whose claims were wholly secured by mortgages on real property. Although the earlier language did not survive, the statute as finally enacted by Congress clearly evidences a concern with the possible effects the new bankruptcy act might have upon the market for homes. If any other policy objective of Congress was adequate to compete against the objective of protecting wage earners generally, it was a policy to encourage the increased production of homes and to encourage private individual ownership of homes as a traditional and important value in American life. Congress had to face the reality that in a relatively free society, market forces and the profit motive play a vital role in determining how investment capital will be employed. Every protection Congress might grant a homeowner at the expense of the holders of security interests on those homes would decrease the at-

tractiveness of home mortgages as investment opportunities. And as home mortgages decrease in attractiveness, the pool of money available for new home construction and finance shrinks.

FN1. This language appeared in the Senate version of the bill, S. 2266, 95th Cong., 2d Sess. *§ 1322 (1978),* not long after Senate committee hearings at which Edward J. Kulik, representing the Real Estate Division of Massachusetts Mutual Life Insurance Company, testified that Chapter 13, as then proposed, might have the unintended effect of restricting the flow of home mortgage money. See Bankruptcy Reform Act of 1978: Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary, 95th Cong., 1st Sess. 707, 714–15 (1977) (statement of Edward J. Kulik, Senior Vice–President, Real Estate Division, Massachusetts Mutual Life Ins. Co.). Specifically, Mr. Kulik was concerned that provisions (1) allowing modification of rights of holders of secured claims and (2) protecting guarantors and codebtors as well as the Chapter 13 debtor might have this effect. He urged: Serious consideration should be given to modifying both bills so that, at the least: One, a mortgage on real property other than investment property may not be modified, and two, providing that the stay of actions against a guarantor or other codebtor is applicable only to guarantees executed after the effective date of the new legislation. *Id.* at 714.

In response to Senator DeConcini's comments questioning the severity of the problem, Robert E. O'Malley, Mr. Kulik's counsel, stated: With respect to the savings and loans, in particular, and the future prospects for loans to individuals under the proposed bills, there is really only one basic problem. That is, the provision in both bills that provides for modification of the rights of the secured creditor on residential mortgages, a provision that is not contained in present law. I think the answer to your question is that, of course, savings and loans will continue to make loans to individual homeowners, but they will tend to be, I believe, extraordinarily conservative and more conservative than they are now in the flow of credit. It seems to me they will have to recognize that there is an additional business risk presented by either or both of these two bills if the Congress enacts chapter XIII in the form proposed, thus providing for the possibility of modification of the rights of the secured creditor in the residential mortgage area. I think the answer is that they will be much more conservative than they have been in the past. *Id.* at 715 (statement of Robert E. O'Malley, Attorney, Covington & Burling).

On the other hand, Congress was determined not to depart too far from its expressed policy of making wage earner plans more attractive to debtors, especially as an alternative to full bankruptcy proceedings under Chapter 7. Therefore, the preferred status granted some creditors under *section 1322(b)(2)* was limited to holders of claims secured only by a security interest in the debtor's principal residence. No preferential treatment was given debts secured by property in addition to the debtor's principal residence. Such debts normally are incurred to make consumer purchases unrelated to the home or to enable the debtor to engage in some form of business adventure. In such circumstances the home is mortgaged not for

its own sake, but for other purposes, and often is only one of several forms of security given. In a consumer purchase the creditor may also take a security interest in the goods purchased, or in a business transaction, the value of the home may be an insufficient security and, therefore, form only a part of the security package. Congress granted no extra protection for holders of these types of secured claims, presumably because any impact the bankruptcy laws might have upon them would not seriously affect the money market for home construction or purchase.

*Federal Land Bank of Louisville v. Glenn et.al.*, 760 F.2d 1428, 1433 (6th Cir.1985).

In this case, the McConnells and the Credit Union entered into a residential loan transaction, the type protected from cram down under 11 U.S.C. § 1322(b)(2). Additionally, although the 60.4 acres covered by the mortgage substantially exceeds the ground upon which the residence is located, the remaining portion is not in fact used to produce significant income. Finally, neither Debtor qualifies as a farmer under the Bankruptcy Code, and they are clearly not using the property for any principal purpose other than residing there. *See In re Ballard,* 4 B.R. 271 (Bankr.E.D.Va.1980). Accordingly, the Credit Union's rights cannot be modified as proposed.

### III.

Based on the forgoing, confirmation of the Debtors' proposed plan, dated May 9, 2003, is denied.